UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────

Nº 08 Civ. 9203 (RJS)

───────────────────

IN RE: NOAH EDUCATIONAL HOLDINGS, LTD. SECURITIES LITIGATION

───────────────────

MEMORANDUM AND ORDER
March 31, 2010

───────────────────

RICHARD J. SULLIVAN, District Judge:

Lead Plaintiff Stephen Atkins brings this putative class action against Defendant Noah Educational Holdings, Ltd., as well as the underwriters for Noah's October 19, 2007 initial public offering ("IPO"), Deutsche Bank Securities Inc., CIBC World Markets Corp., and Thomas Weisel Partners (collectively the "Underwriter Defendants"). Plaintiff alleges that the registration statement and prospectus filed in connection with the IPO contained materially false and misleading information, in violation of sections 11 and 12(a)(2) of the Securities Act of 1933.

Before the Court is Defendants' motion to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, Defendants' motion is granted.

I.   BACKGROUND[1]

A.   Parties

Atkins, as Trustee for the Jae Family Lifetime Benefit Trust, purchased American Depository Shares (ADSs) of Noah during its IPO. (CAC ¶ 6.) He brings this putative class action on behalf of himself and all others who purchased ADSs of Noah in or traceable to the IPO. (*Id.* ¶ 9.)

Defendant Noah develops, markets, and distributes interactive educational content in the People's Republic of China. (*Id.* ¶ 7.) The interactive educational content

───────────────────

[1] The following facts are taken from the Consolidated Amended Class Action Complaint ("Consolidated Complaint" or "CAC"). The Court also considers any written instrument attached to the Consolidated Complaint, statements or documents incorporated into the Consolidated Complaint by reference, legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"), and documents upon which Plaintiff relied in bringing the suit. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

primarily complements textbooks used in China's primary and secondary schools and is embedded into handheld digital learning devices ("DLDs") that account for approximately seventy-five percent of Noah's total revenue. (*Id.* ¶¶ 7, 15.) Noah also sells electronic dictionaries, or E-dictionaries, which account for about twenty-four percent of its total revenue. (*Id.* ¶ 15.)

Defendants Deutsche Bank, CIBC, and Thomas Weisel all served as lead underwriters for Noah's IPO. (*Id.* ¶ 8.)

B.   The Initial Public Offering

On September 24, 2007, Noah filed a Form F-1 Registration Statement with the SEC in advance of its planned IPO. (*Id.* ¶ 16; *see also* Defendants' Request for Judicial Notice Ex. 1 (the "Registration Statement").) The Registration Statement contained Noah's Prospectus. (*Id.* ¶ 17; *see also* Defendants' Request for Judicial Notice Ex. 2 (the "Prospectus").) The Registration Statement and Prospectus became effective on October 19, 2007, after which date more than 9.8 million Noah ADSs were sold at $14.00 per share. The sale raised approximately $137 million. (*Id.* ¶ 17.) Noah also granted the Underwriter Defendants an option to purchase about 1.5 million additional shares to cover over-allotments. (*Id.*)

1.   The Alleged False and Misleading Statements

a.   Rising Raw Material Costs

Plaintiff alleges that the Registration Statement "failed to disclose that, at the time of the IPO, [Noah] was experiencing a significant increase in raw material costs for certain components of the Company's DLDs, such as flash chips and memory boards." (*Id.* ¶ 19.) This information was material, according to the Consolidated Complaint, because Noah's DLDs accounted for approximately seventy-five percent of its total revenue. (*Id.*)

The issue of raw material supply is listed in the "Risk Factors" portion of the Registration Statement under the heading, "Increases in our component or manufacturing costs could reduce our gross margins." (Registration Statement at 18; Prospectus at 18.) It states:

> Cost increases of our components or manufacturing services, whether resulting from shortages of materials, labor or otherwise, including, but not limited to rising cost of materials, transportation, services, labor and commodity price increases could negatively impact our gross margins. In addition, the supply and market prices of raw materials used in the manufacture of our components and finished products may be adversely affected by various factors, such as weather conditions and the occurrence of natural disasters or sudden increases in demand, that would impact our costs of production. Because of market conditions and other factors, we may not be able to offset any such increased costs by adjusting the price of our products.

(Registration Statement at 18; Prospectus at 18.)

On November 19, 2007, one month after the IPO, Noah issued a press release announcing its financial results for the fiscal quarter ending on September 30, 2007. In that press release, Noah reported that its gross profit margin had declined from

2

59.4% in the same quarter the previous year to 50.2% for the most recent quarter. (*Id.* ¶ 30.) The press release "attributed the declining margins to 'an increase in the purchasing cost of certain raw material components of DLDs such as flash chips and memory boards, during July and August.'" (*Id.* (quoting Nov. 19, 2007 Press Release).)

On November 20, 2007, Noah held a conference call with financial analysts and investors to discuss its earnings. (*Id.* ¶ 31.) During that call, Plaintiff alleges that Noah "again attributed the decrease in gross margin for the quarter to 'an increase in the cost of Flash chips and memory [boards] in July and August.'" (*Id.* (quoting Nov. 20, 2007 Earnings Call) (alteration in original).)

### b. Violation of China's Environmental Regulation

The Consolidated Complaint also alleges that the offering documents violated the securities laws by failing to disclose Noah's violation of one of China's environmental-labeling regulations. (*Id.* ¶ 19.) Specifically, the Consolidated Complaint alleges that Noah failed to disclose that it sold its NP800 E-dictionaries without including a warning label on the product, as Chinese regulations required. (*Id.*)

The Registration Statement addresses risks posed by product defects and China's regulatory scheme. (CAC ¶ 26.) It states:

> We have experienced, and in the future may experience, delays in releasing some models and versions of our products due to defects or errors in our products. Our products may contain defects after commercial shipments have begun, which could result in the rejection of our products by retailers, lost sales, diverted development resources and increased customer service and support costs and warranty claims, any of which could harm our business or damage our reputation. Insurance companies in China offer limited business insurance products, and we currently do not have any business disruption insurance. Our products could be subject to involuntary recalls and other actions by governmental authorities. In addition, concerns about potential liability may lead us to recall voluntarily selected products. Any recalls or post-manufacture repairs of our products could harm our reputation, increase our costs or reduce our net sales.

(Registration Statement at 18-19; Prospectus at 18-19.) It also states that one of Noah's strengths is its strong brand:

> Our brand is integral to our sales and marketing efforts and we believe that market awareness of our "Noah" brand has contributed significantly to the success of our business. We also believe that maintaining and enhancing the "Noah" brand is critical to our ability to maintain a competitive advantage. If the value of our brand or image is diminished or if our brand does not continue to be attractive to customers, our business, financial condition and results of operations may be materially and adversely affected. . . . There have been instances of complaints in the past on Internet forums regarding the quality and usefulness of our products, and certain of our advertisements in the past have been reportedly cited by

3

certain government authorities to be deceptive or exaggerations, all of which may negatively affect our brand name and reputation. Our business may also be adversely affected if our public image or reputation were diminished, whether due to unsatisfactory services or products or otherwise.

(Registration Statement at 13; Prospectus at 13.)

Beginning on March 1, 2007, all electronic products in China containing certain hazardous substances were required to have a "Restrictions on Hazardous Substances" ("RoHS") sticker. (*Id.* ¶ 26) The Consolidated Complaint alleges that, although Noah became aware that its NP800 E-dictionaries had been shipped without the required RoHS warning stickers prior to its IPO, it negligently failed to disclose this fact in its offering documents. (*Id.* ¶ 27)

Plaintiff derives the factual support for this allegation from several sources. First, he cites a November 17, 2007 article published in the *Shanghai Daily* that reported that Noah had made an "'emergency recall[] across the country to take . . . [its] electronic dictionaries off the shelves.'" (*Id.* ¶ 29 (quoting November 17, 2007 *Shanghai Daily* article).) The article further stated that the NP800 contained "'excessive amounts of toxic metals that may cause cancer and serious environmental threats.'" (*Id.* (quoting November 17, 2007 *Shanghai Daily* article).)

Subsequently, during the November 20, 2007 earnings call, Noah stated that the "'NP800 DLD . . . was taken to the market without a simple warning sticker that is required on all products sold in China that contain a certain element that is widely used in all types of electronic devices sold in China.'" (*Id.* ¶ 31 (quoting Nov. 20, 2007 Earnings Call).) When asked for more information about the omission, Noah's Executive Vice President, Rick Chen, stated:

> [W]e believe that this is really a minor oversight from our OEMs to not put . . . the proper sticker on one of our products, and we believe that . . . this issue has been put behind us and we have resolved the issues. We're taking this matter very seriously. We regard the product safety with the highest measure and we want to make sure that our product achieves the highest standards of safety in the China [sic] consumer market.

(*Id.* (quoting Nov. 20, 2007 Earnings Call).) During the same call, an unidentified company representative stated that "[t]he impact on revenues from [the NP800] is minor." (*Id.*) The representative did state, however, that Noah was allowing customers to return the product. (*Id.*) The representative added that any marketing or advertising expenditures to counteract the negative press would "not impact our overall sales and marketing budget . . . or our overall sales and marketing expenses for the entire fiscal year." (*Id.*)

2. Drop in Noah's Share Price

Following this series of revelations during the November 20, 2007 conference call, the price of Noah's ADSs fell from $12.46 per share to $6.72 per share "on extremely heavy trading volume." (*Id.* ¶ 32.) By December 10, 2007, Noah's share price had rebounded to $9.33.[2]

---

[2] Defendants submitted a table listing the high, low, and closing prices of Noah ADSs from October 19, 2007 to December 31, 2008 (Defendants' Request for

4

On February 15, 2008, Noah's stock closed at $6.92. On the next business day, February 19, 2008, Noah issued a press release describing its financial results for the fiscal quarter ending December 31, 2007, which stated that "'[s]ales of our DLDs were down primarily due to the market reaction to a missing environmental compliance sticker on one of our products and our subsequent voluntary action to address consumer concerns regarding this issue.'" (*Id.* ¶ 33 (quoting Feb. 19, 2008 Press Release).) The stock closed at $6.79. (*Id.*)

On February 20, 2008, Noah again held an earnings call with financial analysts and investors. (*Id.* ¶ 34.) During that call, Chen reiterated that revenue was primarily down because of the "sticker issue" and then stated, "[w]hen we became aware of the sticker issue early in the quarter, the Company immediately implemented a comprehensive review of our quality control programs to insure [sic] that such an occurrence would not take place again." (*Id.* (quoting Feb. 20, 2008 Earnings Call).) Noah's shares closed at $5.73 that day. On April 4, 2008, the date on which the Consolidated Complaint was filed, Noah's ADS price was $3.25. (*Id.* ¶ 35.)

### C. Procedural History

The initial complaint in this consolidated action was filed on October 27, 2008 in *Seidel v. Noah Educational Holdings, Ltd.*, No. 08 Civ. 9203 (RJS). The second complaint was filed on November 3, 2008 in *Shapiro v. Noah Educational Holdings, Ltd.*, No. 08 Civ. 9427 (RJS). On November 5, 2008, a third complaint was filed in *Sebik v. Noah Educational Holdings, Ltd.*, No. 08 Civ. 9509 (RJS). Finally, on December 4, 2008, a fourth case was added by the filing of a complaint in *Gu v. Noah Educational Holdings, Ltd.*, No. 08 Civ. 10545 (RJS). By Order dated March 9, 2009, the Court consolidated the actions and appointed Plaintiff Atkins as lead Plaintiff and appointed Coughlin Stoia Geller Rudman & Robbins, LLP as lead counsel. (Doc. No. 26.) Plaintiff then filed the Consolidated Complaint on April 8, 2009. Defendants moved to dismiss the newly filed Consolidated Complaint on June 8, 2009, and the motion became fully submitted on September 8, 2009.

### II. DISCUSSION

### A. Legal Standard[3]

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded allegations contained in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A plaintiff need not include "heightened fact pleading of specifics" to survive a Rule 12(b)(6) motion, *id.* at 570, but the "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true," *id.* at 555 (citation omitted). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when

---

Judicial Notice Ex. 8) and the Court takes judicial notice of these prices, s*ee Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).

[3] Because the Court concludes that the Consolidated Complaint fails to meet the requirements of Rule 12(b)(6), it will not address whether the heightened pleading requirements of Rule 9(b) apply.

5

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. In contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555) (citations omitted). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. Sections 11 & 12(a)(2)

In contrast to section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, promulgated thereunder, sections 11 and 12(a)(2) of the Securities Act create liability only for material misrepresentations or omissions in connection with the initial sale and distribution of securities. Section 11 deals with registration statements, while section 12 covers prospectuses. *See* 15 U.S.C. §§ 77k(a), 77l(a)(2) (2006).

Section 11 allows purchasers of a registered security to sue certain statutorily enumerated parties involved in a registered offering when false or misleading information is included in a registration statement. *See* 15 U.S.C. § 77k(a). The statutorily enumerated parties subject to liability include every person who signed the registration statement, the directors of the issuer, and the underwriters of the security. *See id.* Section 12(a)(2) creates liability for any person who offers or sells a security by means of a prospectus or oral communication that includes a material misrepresentation or omission. *See* 15 U.S.C. § 77l(a)(2).

Thus, to adequately plead a claim under section 11, Plaintiff must allege that: (1) Defendant is an individual specified by the statute; (2) Plaintiff purchased the registered securities; and (3) the registration statement for the offering either (a) contained an untrue statement of a material fact, (b) omitted to state a fact in contravention of an affirmative legal disclosure obligation, or (c) omitted to state a material fact necessary to make the statements therein not misleading. *See* 15 U.S.C. § 77k(a). Similarly, to adequately plead a claim under section 12(a)(2), Plaintiff need only allege that (1) Defendant sold or offered a security; (2) by means of a prospectus or oral communication; (3) that included an untrue statement of material fact or omitted a material fact necessary to make such statements not misleading. *See* 15 U.S.C. § 77l(a)(2).

The Court will evaluate Plaintiffs' claims under sections 11 and 12(a)(2) together, since the central issue in this case is the same for claims under both sections — whether the Registration Statement or Prospectus contained an untrue statement of material fact or omitted a material fact required to be stated by law[4] or required to make other statements not misleading. *See,*

---

[4] Although section 11 expressly contemplates liability for the omission of a "material fact required to be stated" in a registration statement, 15 U.S.C. § 77k(a), section 12(a)(2) does not contain a similar requirement, *id.* § 77l(a)(2). Because the Court concludes that Defendants did not violate any affirmative disclosure obligations, it need not address this discrepancy. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 n.8 (2d Cir. 2010).

6

*e.g.*, *In re Morgan Stanley*, 592 F.3d at 360-61; *In re Fuwei*, 634 F. Supp. 2d. at 438.[5]

C.  Noah's Failure To Disclose the Spike in the Cost of Raw Materials

Plaintiff offers two theories as to how Noah violated the securities laws by failing to disclose the increase in the cost of raw materials. First, Plaintiff argues that affirmative disclosure obligations required Noah to disclose this information. In the alternative, Plaintiff asserts that disclosure was necessary to prevent other statements in the offering materials from being false or misleading. The Court will address each theory of liability in turn.

1.  Affirmative Disclosure Obligations

    a.  Applicable Law

Item 303 of Regulation S-K requires an issuer of securities to "[d]escribe any known trends or uncertainties that have had or that [it] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Knowledge of a trend is an essential element triggering disclosure under Item 303. *See Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528 (RWS), 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010).

The Second Circuit has noted that the aim of Item 303 is to explain irregularities in offering documents and prevent a company's last reported financial results from misleading potential investors. *See Lowinger v. Pzena Inv. Mgmt., Inc.*, 341 F. App'x 717, 720 (2d Cir. 2009) (citing *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1192 (11th Cir. 2002)). As such, Item 303 does not require companies to disclose isolated occurrences that affect their financial performance. *Oxford Asset Mgmt.*, 297 F.3d at 1191 ("It may be that a particular pattern is . . . of such short duration that it will not support any conclusions about the registrant's business environment."); *cf. In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (finding that 9% drop in operating income for one-quarter did not constitute a "trend" under Item 303). For example, in *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207 (5th Cir. 2004), the Fifth Circuit held that a sixty percent drop in the price of natural gas over the two-month period before the prospectus was filed, followed by a more gradual decline, was not a trend requiring disclosure under Item 303. 379 F.3d at 218-20.

   b.  Analysis

Plaintiff has not adequately pleaded facts demonstrating a trend of rising raw material costs. The allegations in the Consolidated Complaint suggest that Noah experienced an increase in the cost of raw materials *only* during July and August of 2007. (CAC ¶¶ 19, 23, 28.) In fact, Noah's November 2007 earnings call specifically noted that the cost "spike" had only occurred in July and August, even though the quarter spanned July through September 2007. (*Id.* ¶ 31.) Thus, nothing in the Consolidated Complaint creates a plausible inference that this was a trend rather than an isolated

---

[5]  The Court notes that the Consolidated Complaint does not contain any specific allegations about deficiencies in the Prospectus other than alleging that the Prospectus forms part of the Registration Statement. (CAC ¶ 17.) However, because the specific provisions of the Registration Statement that Plaintiff alleges are actionable also appear in the Prospectus, and because Defendants have not raised this issue, the Court will assume that the allegations relating to the Registration Statement also apply to the Prospectus.

event. *See Blackmoss Invs.*, 2010 WL 148617, at *10 ("As a matter of law, a two-month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303."); *In re Turkcell*, 202 F. Supp. 2d at 13.[6] Further, Plaintiff's own characterization of the changes in raw-material costs as a "spike" (CAC ¶¶ 23, 30, 31), belies allegations that Noah was experiencing a trend of rising costs in raw materials before the IPO.

The Court's conclusion is further bolstered by the SEC's financial reporting regulations, which, at least in the absence of an extreme deviation from past performance, do not require publicly traded companies to disclose interim financial data. *See DeMaria v. Andersen*, 318 F.3d 170, 180-82 (2d Cir. 2003); *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 208-09 (S.D.N.Y. 2000). The cost of raw materials is only one step removed from Noah's reported cost of revenue, a prominent financial metric. (*See* Registration Statement at F-14 (listing raw materials as a primary component of cost of revenue).) Thus, Plaintiff's theory of liability would appear to be little more than an end-run around the carefully delineated SEC regulations that specify what financial data must be disclosed in offering documents.

2. Duty To Avoid Misleading Statements

a.  Applicable Law

A duty to disclose may also arise from the obligation to make statements contained in a registration statement or prospectus "not misleading." *See* 15 U.S.C. §§ 77k(a), 77l(a)(2). This duty is also memorialized in the SEC's general regulations, which require that, "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408.

Whether or not a statement is materially misleading is a "fact-specific" inquiry. *See Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). This fact-specific inquiry should not focus on whether "particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities]." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

b.  Analysis

Plaintiff alleges that the Registration Statement and Prospectus are materially misleading insofar as they state that increases in the cost of raw materials "could" cause a drop in Noah's gross margin when, at the time of the IPO, a spike in the cost of raw materials had, allegedly, already negatively affected Noah's gross margin. (CAC ¶ 23.)

Reading the Registration Statement as a whole, the Court concludes that the

---

[6] *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960 (N.D. Ill. 2006), does not counsel otherwise. Although Plaintiff argues that *Takara Trust* held that the rising costs of raw material is a known trend that must be disclosed pursuant to Item 303, liability in that case arose because the defendants made several affirmative misrepresentations about the cost of raw materials. *Id.* at 973-74. The discussion of Item 303 in the case was limited to a brief footnote reinforcing the court's finding that the affirmative misstatements misled investors. *Id.* at 974 n.7.

statement on page 18 is not false or misleading. The Risk Factors section of the Registration Statement contains twenty-three pages that detail both internal and external factors that might affect Noah's business, and, consequently, the prospective investor's investment in Noah. (*See* Registration Statement at 12-34.) The Court concludes that such cautionary language, in this context, cannot reasonably be read to imply that Noah's cost of raw materials had not increased, to some extent, in the current quarter. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (considering similar factors and finding that boilerplate warnings about dangers of regulatory noncompliance were not actionable as misstatements); *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048-49 (N.D. Cal. 1997) (finding that alleged misstatements were "cautionary statements and are not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results"); *Zeid v. Kimberly*, 930 F. Supp. 431, 437 (N.D. Cal. 1996) (holding that boilerplate warnings of potential adverse factors are not actionable as a matter of law). *But see In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 399-400 (S.D.N.Y. 2005) (concluding that cautionary statements may constitute misleading statements where warned of contingency has already occurred).[7]

Having carefully reviewed the Registration Statement and the Prospectus, the Court concludes that the lengthy, forward-looking recitation of risks facing Noah did not imply that none of these risks, at least to some extent, would affect Noah's most recent fiscal quarter. Accordingly, the Court concludes that Noah's offering documents did not contain false or misleading statements about the cost of raw materials.

\* \* \*

For the foregoing reasons, Plaintiff's claims pursuant to sections 11 and 12(a)(2) pertaining to Noah's failure to disclose a rise in the cost of raw materials must be dismissed.

D. Noah's Failure To Disclose Violations of China's Warning-Label Requirements

The Consolidated Complaint also alleges that Defendants failed to disclose Noah's violation of Chinese environmental-labeling requirements. This claim was first raised in the Consolidated Complaint — filed on April 8, 2009 — rather than in any of the original complaints. Defendants move to dismiss this claim as time barred because it was first raised after the statute of limitations expired and does not relate back to any of the dates of the original complaints.

1. Applicable Law

Claims under sections 11 and 12 must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," and, at the latest, no "more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m. The one-year statute of limitations period begins to run when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice

---

[7] The Court acknowledges the tension between *In re FBR Inc. Securities Litigation* and *In re Van der Moolen Holding N.V. Securities Litigation*. *See In re FBR.*, 544 F. Supp. 2d at 36. Although *In re Van der Moolen* is distinguishable on its facts, the Court finds the reasoning of *In re FBR* persuasive, and concludes that its analysis better fits the facts of this case.

of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992).

Federal Rule of Civil Procedure 15 permits parties to relate an amended complaint back to the date of the original filing when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "The purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 228 (2d Cir. 1983) (internal quotation marks omitted). In determining whether an amended pleading relates back, the central inquiry is "whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86-87 (2d Cir. 1999) (internal quotation marks omitted). "Where the amended complaint does not allege a new claim but renders prior allegations more definite and precise, relation back occurs." *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006). "In contrast, even where an amended complaint tracks the legal theory of the first complaint, claims that are based on an entirely distinct set of factual allegations will not relate back." *Id.* at 228 (quotation omitted).

2. Analysis

Plaintiff filed the Consolidated Complaint on April 8, 2009 (Doc. No. 27), more than one year after Plaintiff was put on notice of the warning label issue, which was, at the latest, during the November 20, 2007 earnings call. (*See* CAC at ¶ 31).[8] Therefore, the warning label claim is time barred unless the Consolidated Complaint relates back to one of the original complaints filed before November 20, 2008. *See* 15 U.S.C. § 77m.

The original complaints filed in this case focus solely on the omission of information about the cost of raw materials. They do not complain of, or discuss, Noah's noncompliance with Chinese regulatory requirements, its labeling practices, or its brand image. Thus, it cannot be said that the Consolidated Complaint's new allegation — that Noah failed to disclose the warning label issue — adds more factual detail or clarification to the claims in the original complaints or alleges similar or related misconduct.

Plaintiff argues that the raw material and warning label allegations are sufficiently related for purposes of Rule 15(c) because both complain of statements made or omitted in the same Registration Statement and Prospectus. (*See* Seidel Compl. at ¶ 18; Pl. Mem. at 24.) This proposition — that once a Plaintiff has complained of one false or misleading statement in offering documents within the limitations period *any* future allegations that other statements were false or misleading may relate back — is untenable. *See In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 528 (S.D.N.Y. 2005) (finding that new section 11 and 12(a)(2) claims based on same offering documents

---

[8] The Consolidated Complaint and Plaintiff's Memorandum both note that the *Shanghai Daily* published an article about Noah's failure to appropriately label some of its products on November 17, 2007. (CAC at ¶ 29; Pl. Mem. at 15.) Because it does not affect the outcome, the Court will use the later date — November 20, 2007 — for the purpose of deciding this issue.

10

did not relate back because original allegations did not provide adequate notice as to the nature of the new claims). Rather, relation back is only appropriate in securities actions where the new allegations relate to the same or similar conduct complained of in the original complaint. *See, e.g., Slayton*, 460 F.3d at 229 (allowing new claims to relate back to original complaint where all claims revolved around misrepresenting the same high-yield investment scheme); *Alcatel*, 382 F. Supp. 2d at 528 (finding that new claims alleging misstatements regarding certain acquisitions did not relate back to claims in the initial complaint, which alleged misstatements about inventory and decreased consumer demand for defendant's products); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 209 (S.D.N.Y. 2004) (holding that allegations of additional omissions in the offering documents did not relate back); *see also Belodoff v. Netlist, Inc.*, No. 07 Civ. 677 (DOC), 2009 WL 1293690, at *12 (C.D. Cal. 2009) (allowing relation back where "the two pleadings speak to the same, similar, and/or related events," but noting that "the Court's holding does not imply that Plaintiffs could make *any* claim regarding misrepresentations in the Prospectus indefinitely"). Thus, because the warning label issue arises from an entirely separate set of facts from the raw material issue, the warning label allegations do not relate back to the filing of any of the original complaints.

Because the Court finds that the warning label claims do not relate back to the conduct alleged in the initial complaints, they are time barred and are therefore dismissed.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The Clerk of Court is directed to terminate the motion located at docket number 39 and to close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

Dated:   March 31, 2010
         New York, New York

\* \* \*

Lead Plaintiff is represented by Samuel H. Rudman, David A. Rosenfeld, and Fainna Kagan, Coughlin Stoia Geller Rudman & Robbins, LLP, 58 South Service Road, Suite 200, Melville, New York 11747. Defendant Noah Educational Holdings is represented by Christopher Harris, Latham & Watkins LLP, 885 Third Avenue, Suite 1000, New York, New York 10022, and James J. Farrell, Terri L. Lilley, Melanie M. Blunschi, and Wendy P. Harper, Latham & Watkins LLP, 355 South Grand Avenue, Los Angeles, California 90071. The Underwriter Defendants are represented by Charles A. Gilman, Joel Kurtzberg, and Kayvan B. Sadeghi, Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/10